UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ALPHA CAPITAL ANSTALT,

                              Plaintiff,

      -against-

INTELLIPHARMACEUTICS
INTERNATIONAL INC., ISA ODIDI,
AMINA ODIDI, and ANDREW PATIENT,

                             Defendants.

Case No. 19-cv-09270 (DLC)

---------------------------------------------------------------x

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1 OF THE LOCAL CIVIL RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................1

II. RISK DISCLOSURES........................................................................................3

III. ALPHA'S DUE DILIGENCE .............................................................................4

IV. ALPHA'S PURCHASE OF IPCI SECURITIES ............................................................8

V. ANDREW PATIENT'S RESIGNATION .....................................................................9

VI. IPCI COMMON SHARE PRICE MOVEMENT ........................................................13

**I.     PRELIMINARY STATEMENT**

1.  Alpha Capital Anstalt ("Alpha" or "Plaintiff") is an institutional investor located in Liechtenstein, with a business address of Lettstrasse 32, 9490, Vaduz, Liechtenstein. Booth Ex. 1 at ¶ 2 (Complaint); Booth Ex. 2 at 11:17-18 (A. Kluger Dep. (Nov. 2, 2020)).

    1.1  Plaintiff has filed at least 24 actions in the Southern District of New York attempting to recoup losses from failed investments. Booth Ex. 3 at Nos. 1, 5-11, 13-17, 19-26, 28, 31-32 (RFAs and RFA Responses).

2.  Intellipharmaceutics International Inc. ("IPCI" or the "Company") is a Canadian corporation, with a principal executive office located at 30 Worcester Road, Toronto, Ontario, Canada, M9W 5W2. Booth Ex. 1 at ¶ 3 (Complaint).

3.  IPCI is a biotechnology development company. Booth Ex. 4 at 48:11-14 (A. Patient Dep. (Oct. 21, 2020)). The Company's area of expertise is formulation technology, developing new mechanisms for drug delivery and how the medication reacts. *Id*. at 48:15-22. The Company focuses on extended-release drugs. Booth Ex. 5 at 32:14-23 (I. Odidi Dep. (Dec. 22, 2020)).

    3.1  At all relevant times, Dr. Isa Odidi served as Chairman of the Board, Chief Executive Officer and Co-Chief Scientific Officer of IPCI. Booth Ex. 1 at ¶ 4 (Complaint).

    3.2  At all relevant times, Dr. Amina Odidi served as President of the Board, Chief Operating Officer and Co-Chief Scientific Officer of IPCI. Booth Ex. 1 at ¶ 5 (Complaint).

    3.3  Andrew Patient ("Patient") served as the Chief Financial Officer ("CFO") of IPCI from September 2017 until November 30, 2018. Booth Ex. 6 at IPCI-0000161 (IPCI-0000160); Booth Ex. 7 (A. Patient Resignation Announcement).

4.  In order to continue its development of breakthrough drug delivery systems, the Company decided to raise money in the form of an offering. Booth Ex. 5 at 46:15-21 (I.

Odidi Dep. (Dec. 22, 2020)). Additional capital was necessary in order to complete required clinical trials for a product that was currently before the Food and Drug Administration. Booth Ex. 4 at 121:17-122:24 (A. Patient Dep. (Oct. 21, 2020)).

5. At the time of the Offering, the Company disclosed that it, "need[ed] to obtain additional funding as [it] further[s] the development of [its] product candidates." Booth Ex. 8 at 46 (Registration Statement).

6. On September 20, 2018, IPCI filed an initial registration statement and prospectus on Form F-1 with the Securities and Exchange Commission ("SEC"). Booth Ex. 1 at ¶ 10 (Complaint). IPCI filed Amendment No.1 to this registration statement with the SEC on October 4, 2018 and Amendment No. 2 to this registration statement on October 11, 2018 (the registration statement, as amended, the "Registration Statement"). Booth Ex. 1 at ¶ 10 (Complaint). The Registration Statement included a preliminary prospectus. Booth Ex. 8 (Registration Statement).

7. The SEC declared the Registration Statement effective at 5:00pm Eastern Time on October 11, 2018. Booth Ex. 9 (Notice of Effectiveness).

8. The Company executed the Registration Statement. Booth Ex. 8 (Registration Statement).

   8.1 Dr. Isa Odidi, in his capacity as Chairman of the Board, Chief Executive Officer and Co-Chief Scientific Officer of IPCI, executed the Registration Statement. Booth Ex. 8 (Registration Statement).

   8.2 Dr. Amina Odidi, in her capacity as President of the Board, Chief Operating Officer and Co-Chief Scientific Officer of IPCI, executed the Registration Statement. Booth Ex. 8 (Registration Statement).

   8.3 Patient, in his capacity as CFO of IPCI, executed the Registration Statement. Booth Ex. 8 (Registration Statement).

9. Pursuant to the Registration Statement and Prospectus, IPCI sold securities designated as "Units" and "Pre-Funded Units" ("the Offering"). Booth Ex. 2 at 76:22-77:14; 78:19-24 (A. Kluger Dep. (Nov. 2, 2020)); Booth Ex. 10 at 5 (October 12 SEC Form 424B4).

10. Each Unit consisted of (i) one share of common stock, no par value, of the Company (a "Common Share") and (ii) one warrant to purchase one Common Share at an exercise price of $0.75, which warrant would expire on the expiration of five years from the date of issuance ("Firm Warrant"). Booth Ex. 10 at cover page, 5 (October 12 SEC Form 424B4).

11. Each Pre-Funded Unit consisted of (i) one "Pre-Funded Warrant" to purchase one Common Share at an exercise price of $0.01, which warrant would expire upon exercise, and (ii) and one Firm Warrant. Booth Ex. 10 at 5 (October 12 SEC Form 424B4).

**II.    RISK DISCLOSURES**

12. In connection with the Offering, IPCI disclosed to potential investors various risks associated with investing in in the Company, stating that investing in its securities involves "substantial risks." Booth Ex. 10 at 6-16 (October 12 SEC Form 424B4).

13. IPCI disclosed the following risk:

> Although we have employment agreements with key members of our management team, *each of our employees may terminate his or her employment at any time*. The success of our business depends, in large part, on our continued ability to attract and retain qualified management, scientific, manufacturing and sales and marketing personnel. . . . If we lose the services of our executive officers or other qualified personnel or are unable to attract and retain qualified individuals to fill these roles . . . our business, financial conditions and results of operations could be materially adversely affected.

Booth Ex. 10 at 10 (October 12 SEC Form 424B4) (emphasis added).

14. In its "Cautionary Note Regarding Forward-Looking Information," the Company described risks, uncertainties and other factors that could affect its actual results. Booth Ex. 10 at 17-19 (October 12 SEC Form 424B4). Among the items listed was the Company's "ability to retain and hire qualified employees." *id*. at 18.

15. IPCI disclosed the following risk:

> Sales of a substantial number of our Common Shares or securities convertible or exchangeable into Common Shares in the public markets

3

could depress the market price of the Common Shares. . . . We cannot predict the effect that future sales of Common Shares would have on the market price of our Common Shares. . . . The market price of our Common Shares could decline as a result of sales of Common Shares.

Booth Ex. 10 at 15 (October 12 SEC Form 424B4).

16. IPCI disclosed that it is "dependent upon the scientific expertise of Dr. Isa Odidi. . . and Dr. Amina Odidi." Booth Ex. 10 at 10 (October 12 SEC Form 424B4).

17. IPCI disclosed that "Drs. Isa and Amina Odidi are our *only* employees with the knowledge and experience necessary for us to continue the development of controlled-release products." Booth Ex. 10 at 10 (October 12 SEC Form 424B4) (emphasis added).

18. Dr. Isa Odidi has had a long career in the pharmaceutical and health care industry and brings valuable experience to IPCI. Booth Ex. 11 (I. Odidi Dep. Ex. 1 (Dec. 22, 2020)).

19. Dr. Amina is an accomplished scientist and brings valuable experience to IPCI. Booth Ex. 5 at 79:17-80:14 (I. Odidi Dep. (Dec. 22, 2020)); Booth Ex. 8 at 22 (Registration Statement).

20. IPCI did not disclose that it was "dependent" on the financial management experience of Andrew Patient. *See* Booth Ex. 10 (October 12 SEC Form 424B4).

21. An employee's resignation, such as Patient's, is one of the risks of which the Company fully informed potential investors prior to the close of the Offering. Booth Ex. 10 (October 12 SEC Form 424B4).

### III. ALPHA'S DUE DILGENCE

22. Alpha regularly invests in pharmaceutical companies. Booth Ex. 2 at 12:23-25 (A. Kluger Dep. (Nov. 2, 2020)).

   22.1 LH Financial Services Corp. ("LH") provides due diligence services to Plaintiff with respect to potential investments in the United States. Booth Ex. 2 at 10:13-20 (A. Kluger Dep. (Nov. 2, 2020)).

22.2 LH exclusively provides advice to Plaintiff with respect to investments in the United States and, in connection therewith, conducts financial and business due diligence regarding targeted companies. Booth Ex. 2 at 10:21-23, 11:19-12:6 (A. Kluger Dep. (Nov. 2, 2020)).

22.3 Ari Kluger ("Kluger") is an employee of LH. Booth Ex. 2 at 5:14-16 (A. Kluger Dep. (Nov. 2, 2020)).

23. In connection with the Offering, Kluger attended a "roadshow" presentation on October 9, 2018 where Patient made a presentation. Booth Ex. 4 at 120:4-7 (A. Patient Dep. (Oct. 21, 2020)); Booth Ex. 5 at 67:19-68:4 (I. Odidi Dep. (Dec. 22, 2020)).

24. At this meeting, Patient used a "roadshow" presentation discussing the merits of investing in IPCI securities (the "Presentation"). Booth Ex. 12 (Roadshow Presentation).

24.1 The Presentation highlighted that IPCI possessed "over 30 issued patents related to advanced drug delivery technologies." Booth Ex. 12 at 6 (Roadshow Presentation).

24.2 The Presentation highlighted the Company's promising progress with respect to two drugs, Oxycodone-ER and Regabatin XR. Booth Ex. 12 at 6, 13-17 (Roadshow Presentation).

24.3 The Presentation highlighted the Company's unique drug delivery technologies. Booth Ex. 12 at 18-20 (Roadshow Presentation).

25. Patient made this roadshow presentation to numerous other potential investors and they "want[ed] to talk to the scientists, not the CFO." Booth Ex. 4 at 148:11-17 (A. Patient Dep. (Oct. 21, 2020)).

26. Patient testified that IPCI investors viewed the Company "as a science development company" and were "investing in the creative and intelligence of the scientists themselves and the development, the lab, not the person that's running the finances." Booth Ex. 4 at 149:8-18 (A. Patient Dep. (Oct. 21, 2020)).

27. When Dr. Odidi was not able to attend the numerous roadshow presentations, including the one with LH, Patient fielded questions about Dr. Odidi's absence because the Offering was the Company's biggest capital raise to date and was, "highly contingent on the success of the oxycodone product which is obviously a science-relevant question." Booth Ex. 4 at 148:21-149:7 (A. Patient Dep. (Oct. 21, 2020)).

28. Following the October 9, 2018 meeting, LH prepared a memorandum describing the merits of making an investment in IPCI (the "Memorandum"). Booth Ex. 2 at 41:22-43:22 (A. Kluger Dep. (Nov. 2, 2020)); Booth Ex. 13 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020)).

29. The Memorandum summarizes most of the facts Kluger relied upon in forming his recommendation to Plaintiff to invest in IPCI. Booth Ex. 2 at 45:4-10 (A. Kluger Dep. (Nov. 2, 2020)).

   29.1 The Memorandum included the following as merits of investing in the Company: (i) The clinical part of studies to provide proof to abuse-deterrent claims via intranasal and oral administration has been completed and the statistical analysis is currently underway, with expected NDA resubmission in late 2018; (ii) the Company is listed on NASDAQ with a compelling valuation; and (iii) the Company's founders have continuously funded the Company. Booth Ex. 13 at AIPICI00000178 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020)).

   29.2 The Memorandum included the following as risks of investing in the Company: (i) The Company's focus thus far has been on generic products and the Company has had declining revenue to date; (ii) the Company's stock price is approaching $1.00 and therefore subject to risk of delisting; and (iii) the Common Shares are subject to potential dilution due to the Company's outstanding $1.85 million in unsecured convertible debt. Booth Ex. 13 at AIPICI00000178 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020)).

   29.3 Patient's credentials and experience were not discussed in the Memorandum. Booth Ex. 13 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020)).

29.4 The only mention of Patient in the Memorandum is on the last page as a point of contact for the Company. Booth Ex. 13 at AIPICI00000179 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020)).

30. On October 12, 2018, LH wrote to Plaintiff indicating, "[t]his is a shelf being done at [a] really low valuation. We are recommending $2M." Booth Ex. 14 at AIPCI00000602 (AIPCI00000601).

31. By November 2018, Kluger did not remember that the name of the IPCI representative with whom he met on October 9, 2018 was Andrew Patient. Booth Ex. 15 (A. Kluger Dep. Ex. 16 (Nov. 2, 2020)).

32. Kluger does not recall whether or not Patient brought any drug formulation experience to IPCI. Booth Ex. 2 at 48:21-24 (A. Kluger Dep. (Nov. 2, 2020)).

33. Neither Kluger nor any other LH representative had any discussions with Plaintiff concerning Patient. Booth Ex. 2 at 60:5-12 (A. Kluger Dep. (Nov. 2, 2020)).

34. Kluger does not recall, if as part of his due diligence, he ever reviewed IPCI's prospectus. Booth Ex. 2 at 54:22-25 (A. Kluger Dep. (Nov. 2, 2020)).

35. Following his October 9, 2018 meeting with Patient, Kluger recommended to Plaintiff that it purchase IPCI securities pursuant to the Offering. Booth Ex. 2 at 43:10-14 (A. Kluger Dep. (Nov. 2, 2020)). The principal reasons for his recommendation were:

35.1 The number of patents held by the Company. Booth Ex. 2 at 65:25-66:6 (A. Kluger Dep. (Nov. 2, 2020)).

35.2 The fact that the Company had several products on which it was currently working. Booth Ex. 2 at 65:18-24 (A. Kluger Dep. (Nov. 2, 2020)).

35.3 The progress of the Company's clinical studies. Booth Ex. 2 at 44:10-14 (A. Kluger Dep. (Nov. 2, 2020)); *id.* at 45:16-46:18; Booth Ex. 13 at AIPICI00000178 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020).

35.4 That the Company was listed on NASDAQ and the value of its shares was compelling. Booth Ex. 2 at 44:10-14 (A. Kluger Dep. (Nov. 2, 2020)); Booth Ex. 13 at AIPICI00000178 (A. Kluger Dep. Ex. 4 (Nov. 2, 2020).

## IV. ALPHA'S PURCHASE OF IPCI SECURITIES

36. Pursuant to the Offering, IPCI issued 2,775,231 Common Shares, 16,563,335 Pre-Funded Warrants, 20,000,000 Firm Warrants and 1,160,314 Placement Agent Warrants. Booth Ex. 8 (Registration Statement); Surana Decl. ¶ 1, Ex. A at ¶ 14, n.12 (Surana Report).

37. Pursuant to the Offering, and upon the recommendation of Kluger and LH, Plaintiff purchased 2,266,667 Pre-Funded Units on October 12, 2018 for $1,677,333. Booth Ex. 3 at No. 35 (Alpha RFA response); Booth Ex. 2 at 42:20-24 (A. Kluger Dep. (Nov. 2, 2020)).

38. Between October 2018 and January 2020, Plaintiff exercised 2,242,249 of the Pre-Funded Warrants it purchased in the Offering and paid $0.01 for each Common Share issued to it upon such exercise. Booth Ex. 3 at No. 36 (Alpha RFA response); Booth Ex. 16 (AIPCI00000800).

   38.1 Plaintiff exercised 500,000 Pre-Funded Warrants on October 12, 2018. Booth Ex. 17 (AIPCI00000015); Booth Ex. 18 (AIPCI0000019).

   38.2 As a result of the exercises on October 12, 2018, Plaintiff received 500,000 Commons Shares on October 18, 2018. Booth Ex. 16 (AIPCI00000800).

   38.3 Plaintiff sold 351,000 Common Shares on October 18, 2018. Booth Ex. 16 (AIPCI00000800).

   38.4 On December 13, 2019 Plaintiff received 616,667 Common Shares in connection with the Offering. Booth Ex. 16 (AIPCI00000800).

   38.5 Plaintiff sold 95,900 Commons Shares on December 13, 2019. Booth Ex. 16 (AIPCI00000800).

38.6  Between December 13 and December 31, 2019, Plaintiff sold 445,642 Commons Shares it received in connection with the Offering. Booth Ex. 16 (AIPCI00000800).

39. Between October 2018 and January 2020, Plaintiff sold 2,242,249 Common Shares, which it had acquired by exercising the Pre-Funded Warrants acquired in the Offering. Booth Ex. 3 at Nos. 38-39 (Alpha RFA response); Booth Ex. 16 (AIPCI00000800).

40. Plaintiff received payments totaling $1,441,523.76 for the 2,242,249 Commons Shares it sold between October 2018 and January 2020. Booth Ex. 3 at No. 40 (Alpha RFA response).

41. As a result of its sales of 2,242,249 Common Shares between October 2018 and January 2020, Plaintiff sold all of its Common Shares acquired in the Offering. Booth Ex. 3 at No. 41 (Alpha RFA response); Booth Ex. 16 (AIPCI00000800).

42. On or about December 3, 2018, Kluger recommended to Plaintiff that it purchase Common Shares. Booth Ex. 2 at 116:4-6 (A. Kluger Dep. (Nov. 2, 2020)).

43. This recommendation was made knowing that the Company had announced that Patient had tendered his resignation. Booth Ex. 2 at 128:21-129:6 (A. Kluger Dep. (Nov. 2, 2020)); *id*. at 105:21-106:8.

44. Upon the recommendation of Kluger, on December 3, 2018, Plaintiff purchased 279,618 Common Shares on the open market, after Kluger knew Patient had resigned from IPCI. Booth Ex. 3 at No. 44 (Alpha RFA response); Booth Ex. 2 at 128:21-129:6 (A. Kluger Dep. (Nov. 2, 2020)); Booth Ex. 2 at 130:13-16 (A. Kluger Dep. (Nov. 2, 2020)).

**V.    ANDREW PATIENT'S RESIGNATION**

45. Patient became the CFO of IPCI on September 6, 2017. Booth Ex. 6 at IPCI-0000161 (IPCI-0000160).

46. Patient's employment agreement provided that he "may terminate this Agreement at any time by written notice to the Company of not less than 30 business days." Booth Ex. 6 at IPCI-0000164 (IPCI-0000160).

9

47. IPCI disclosed to potential investors that its employees may terminate their employment at any time. *Supra*, Paragraph 13.

48. In August or September 2018, Patient was introduced to the CEO of a startup called Mimi's Rock Corp. ("Mimi's Rock") and was presented with a potential employment opportunity. Booth Ex. 4 at 76:22-77:6 (A. Patient Dep. (Oct. 21, 2020)).

49. On or about September 17, 2018, Patient signed an employment agreement with Mimi's Rock. Booth Ex. 19 at IPCI_0000255 (IPCI_0000252).

50. Nothing in Patient's employment agreement with the Company prevented him from engaging in side work outside of IPCI. Booth Ex. 6 at (IPCI-0000160).

51. The employment agreement stated that Patient's commencement date was to be "on or about October 9th, 2018 (date to be confirmed)." Booth Ex. 19 at IPCI_0000253 (IPCI_0000252).

52. Patient did not begin full-time employment at Mimi's Rock until December 2018. Booth Ex. 4 at 81:7-13 (A. Patient Dep. (Oct. 21, 2020)).

53. Patient testified that when he signed the Mimi's Rock employment agreement it was understood he would be working for them on a part-time basis. Booth Ex. 4 at 80:12-81:2 (A. Patient Dep. (Oct. 21, 2020)) ("Q. Did you ultimately commence permanent full-time employment with Mimi's Rock on or about October 9th, 201[8] ? A. I started working with them in late October. It wasn't October 9th. . . . And it wasn't full-time. Q. Did something change. . . ? A. No. It was not always the plan. The plan was that I would not be full-time initially.").

54. Patient testified that Mimi's Rock understood that, when Patient signed the employment agreement, he would be a part-time employee until some date in the future. Booth Ex. 4 at 112:7-11 (A. Patient Dep. (Oct. 21, 2020)).

55. Patient testified that, on September 17, 2018, when he signed the employment agreement with Mimi's Rock, he did not have any intention of resigning from IPCI. Booth Ex. 4 at 86:20-24 (A. Patient Dep. (Oct. 21, 2020)) ("Q. When you signed this employment

10

agreement with Mimi's Rock on or about September 17th, 2018 that was effectively a decision to leave the company, correct? A. Incorrect."); *Id*. at 100:6-12 ("Q. It's your testimony that because you're transitioning to Mimi's Rock has no bearing on the fact that you're going to be leaving Intellipharmaceutics; is that your testimony today? A. It has no bearing. There was not -- I had not made a decision at this point to leave Intellipharmaceutics, no.").

56. Patient testified that he intended to work for both IPCI and Mimi's Rock. Booth Ex. 4 at 87:12-14 (A. Patient Dep. (Oct. 21, 2020)) ("Q. You were going to hold both jobs? A. There's nothing precluding me from having a few roles. Yep, I did.").

57. Prior to signing his employment contract with Mimi's Rock., but during his tenure at IPCI, Patient owned a granite business. Ex. 4 at 87:16-88:5 (A. Patient Dep. (Oct. 21, 2020)) ("It's my own side business. I have multiple businesses. There's nothing that says on any of these [employment contracts] I can't have multiple businesses. So I had it.").

58. When Patient signed the employment agreement with Mimi's Rock's on or about September 17, 2018, IPCI was not aware that Patient would be resigning as Patient had not yet decided to leave IPCI. Booth Ex. 4 at 86:4-15 (A. Patient Dep. (Oct. 21, 2020)).

59. Prior to the Offering, neither the company nor the Odidis were aware that Patient had signed an employment agreement with Mimi's Rock. Booth Ex. 5 at 131:2-5 (I. Odidi Dep. (Dec. 22, 2020)).

60. On November 2, 2018, Patient tendered his resignation as CFO of the Company to Drs. Isa and Amina Odidi. Booth Ex. 20 at IPCI-0000215 (I. Odidi Dep. Ex. 6 (Dec. 22, 2020)).

61. Prior to November 2018, Patient had not determined that he would resign as CFO of IPCI and leave the Company by year end. Booth Ex. 4 at 136:23-137:4 (A. Patient Dep. (Oct. 21, 2020)).

62. Prior to November 2018, Patient did not have any discussions with anyone at the Company, including Dr. Isa Odidi or Dr. Amina Odidi, regarding the possibility that he would resign. Booth Ex. 4 at 136:23 -137:4 (A. Patient Dep. (Oct. 21, 2020)).

63. Prior to November 2018, Patient had not disclosed to anyone at IPCI that he had engaged in negotiations to become the CFO of Mimi's Rock either on a part-time or full-time basis. Booth Ex. 4 at 137:18-23 (A. Patient Dep. (Oct. 21, 2020)).

64. Prior to November 2018, Patient had not informed anyone at IPCI that he had signed an employment agreement with Mimi's Rock. Booth Ex. 4 at 97:3-7 (A. Patient Dep. (Oct. 21, 2020)).

65. Prior to November 2018, Patient did not discuss his continued employment with IPCI with Dr. Isa Odidi. A. Patient Dep. Booth Ex. 4 at 97:8-12 (A. Patient Dep. (Oct. 21, 2020)).

66. Dr. Isa Odidi was surprised to receive Patient's resignation on November 2, 2018. Booth Ex. 5 at 74:6-19 (I. Odidi Dep. (Dec. 22, 2020)). ("Q. Why was it a shock? A. We just raised money. We just raised a lot of money. So why should anybody be leaving. Everything was fine as far as I was concerned. We just raised money. Research was going very well. We planned to file drugs with the FDA. You know, the company's future looked so bright at that time. So that's why it would have been surprising.").

67. On November 5, 2018, Patient sent Drs. Isa and Amina Odidi an updated reisgantion letter, where he clarified that he was leaving the Company for personal reasons and to pursue another aopportunity. Booth Ex. 4 at 144:13-21 (A. Patient Dep. (Oct. 21, 2020)). Later that same day, IPCI filed a form 6-K with the SEC, announcing Patient's resignation from the Company, effective November 30, 2018 and stating that he would continue as a consultant for the Company until December 31, 2018. Booth Ex. 7 (A. Patient Resignation Announcement).

68. Following the announcement of Patient's resignation, Dr. Isa Odidi does not recall receiving inquiries from investors who were concerned about Patient leaving; investors

12

were only concerned about the possibility of financial impropriety. Booth Ex. 5 at 91:7-25 (I. Odidi Dep. (Dec. 22, 2020)).

69. In response to these inquiries, Dr. Isa Odidi assured investors that there were no financial improprieties and that Patient resigned for personal reasons. Booth Ex. 5 at 91:7-25 (I. Odidi Dep. (Dec. 22, 2020)).

70. Kluger did not consider Patient's offer to provide consulting services to IPCI beyond his resignation to be of any significance to an investment in the Company. Booth Ex. 2 at 129:25-130:7 (A. Kluger Dep. (Nov. 2, 2020)).

71. Patient's resignation from IPCI became effective November 30, 2018. Booth Ex. 20 at IPCI-0000215 (I. Odidi Dep. Ex. 6 (Dec. 22, 2020)).

72. Patient offered to continue to provide services to the Company until December 31, 2018 and would provide consulting services thereafter, at the Company's discretion, "to ensure smooth transition of the role and offer any assistance to my replacement." Booth Ex. 20 at IPCI-0000215 (I. Odidi Dep. Ex. 6 (Dec. 22, 2020)).

73. Patient continued to provide services to the Company until February 2019. Booth Ex. 4 at 138:7-13 (A. Patient Dep. (Oct. 21, 2020)).

74. IPCI appointed Greg Powell as the new CFO of the Company on February 4, 2019. Booth Ex. 21 (IPCI 2/4/2019 announcement).

## VI. IPCI COMMON SHARE PRICE MOVEMENT

75. Between October 11 and November 5, 2018, the closing trading price of one Common Share declined from $0.81 to $0.58. Booth Ex. 22 (Market Price Data).

76. The decline in share price between October 12 and November 5, 2018 is not attributable to Patient's resignation given his resignation was not publicly announced until after the close of markets on November 5, 2018. Surana Decl. ¶ 1, Ex. A at ¶¶ 43, 47 (Surana Report).

13

77. On November 6, 2018, the closing trading price of one Common Share was $0.53. Booth Ex. 22 (Market Price Data).

78. The decline in share price between November 5, and November 6, 2018 was not statistically significant and was consistent with how the stock performed historically under similar market conditions. Surana Decl. ¶ 1, Ex. A at ¶¶ 31-33, 43, 47 (Surana Report).

79. On November 8, 2018, IPCI Common Shares traded as high as $0.57 per share during the trading session. Booth Ex. 22 (Market Price Data).

80. On November 26, 2018, the closing trading price of one Common Share was $0.56. Booth Ex. 22 (Market Price Data).

81. Any decline in share price following the November 6, 2018 announcement of Patient's resignation was within the normal range of price volatility. Surana Decl. ¶ 1, Ex. A at ¶¶ 31, 33, 47 (Surana Report).

82. That the decline in share price following the announcement of Andrew Patient's resignation was within the normal range of price volatility means that it is "statistically indistinguishable from zero." Surana Decl. ¶ 1, Ex. A at ¶ 31 (Surana Report).

83. Any decline in the value of the price of Common Shares following the Offering is not attributable to any statement or omission in the Registration Statement regarding Patient's resignation. Surana Decl. ¶ 1, Ex. A at ¶ 45 (Surana Report).

84. The alleged omission regarding Patient's intention to leave IPCI by December 31, 2018 from the Registration Statement was not material. Surana Decl. ¶ 1, Ex. A at ¶¶ 33, 47 (Surana Report).

85. On November 26, 2018, NASDAQ announced that that IPCI was not in compliance with NASDAQ listing rules. Booth Ex. 23 (11-26-2018 6-K). IPCI filed a form 6-K pursuant to that announcement. *Id*.

86. Following the disclosure referenced in paragraph 85, IPCI shares dropped to $0.34 at the close of trading on November 27. Booth Ex. 22 (Market Price Data).

Dated: January 15, 2021

By: /s/ *Steven S. Fitzgerald*

Steven S. Fitzgerald
Chloe S. Booth
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
sfitzgerald@wmd-law.com
cbooth@wmd-law.com

*Attorneys for Defendants*