# EXHIBIT 6

| From: | Dr Amina Odidi |
|---|---|
| To: | Rich DiStefano |
| Subject: | Copy of Andrew's employment agreement |
| Date: | Sunday, November 4, 2018 11:29:18 AM |
| Attachments: | Andrew Patient_employment agreement_fully executed.pdf<br>ATT00001.htm |

Hi Rich

**Redacted**

Regards,

Amina

CONFIDENTIAL												IPCI-0000160

**EMPLOYMENT AGREEMENT** as of the 30th day of August, 2017

BETWEEN:

**INTELLIPHARMACEUTICS INTERNATIONAL INC.**
30 Worcester Road,
Toronto, ON M9W 5X2

-and-

**INTELLIPHARMACEUTICS CORP.**
30 Worcester Road,
Toronto, ON M9W 5X2

(together, the "Company")

-and-

**ANDREW PATIENT**
of the City of Oakville,
in the Province of Ontario
(the "Employee")

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, the Company hereby engages the Employee as a full-time employee, and the Employee hereby agrees to faithfully and diligently serve as a full-time employee of the Company in a manner satisfactory to the Company upon and subject to the following terms and conditions which are hereby agreed between the parties:

### 1.0 JOB DESCRIPTION

1.1 The Employee shall be employed as Chief Financial Officer of the Company and its affiliates, commencing from September 6, 2017 (the "Commencement Date").

### 2.0 DUTIES

2.1 The Employee hereby agrees that:

(a) In his position as Chief Financial Officer, he will perform the role, duties and responsibilities described in Schedule A attached hereto and all tasks and services as the Company may from time to time reasonably require in relation thereto; provided, however, that any such tasks and services shall be commensurate and consistent with the tasks and services provided to a public company by its Chief Financial Officer; and

(b) He will devote his full business time and attention to the performance of his obligations hereunder in a manner consistent with the position set out in section 1.0 and acknowledges that his hours of employment may be irregular.

- 2 -

The Employee will keep, observe and perform all of the policies, guidelines, rules, regulations and duties that may from time to time be adopted or prescribed by the Company and act at all times in the best interests of the Company.

### 3.0 SALARY AND BENEFITS

3.1  **Salary and Annual Bonus:** As compensation for the Employee's performance of the duties herein enumerated the Company shall pay to the Employee an annual base salary (the "Base Salary") of $300,000, pro-rated for partial periods, which salary shall be payable in arrears in equal bi-weekly instalments, pro-rated for partial periods.

The Employee shall be eligible, in the discretion of the Board of Directors of the Company, to receive an annual bonus, comprised of a combination of cash and options to purchase shares of the Company, in an amount targeted at up to 40% of the Employee's Base Salary as paid in the preceding year, exclusive of car allowance, at the time such bonus, if any, is awarded, based upon the availability of funds and/or options, and the achievement of Company and personal goals as set out at the commencement of each calendar year or part thereof as the case may be after mutual discussion and agreement. Such bonus may be increased beyond such 40% up to a total of 50% of the Employee's Base Salary as paid in the preceding year, exclusive of car allowance, at the time such bonus is awarded, based upon the availability of funds and/or options, and the surpassing of such Company and personal goals. The Company shall be entitled to withhold those amounts from such salary or bonus or any other cash payment or other compensation or remuneration as shall be required under any relevant taxing or other statutory authority including, without limitation, the *Income Tax Act* (Canada), the *Employment Insurance Act* (Canada) and the *Canada Pension Plan Act* (Canada). All cash compensation shall be paid by the Company's operating subsidiary IntelliPharmaCeutics Corp.

3.2  **Car Allowance:** As of the commencement of employment, the Employee shall receive a car allowance of $1,500 per calendar month pro-rated for partial periods. It is acknowledged that such amount is required to be recognized, for income tax purposes, as a taxable benefit to the Employee.

3.3  **Benefits:** Immediately upon the Commencement Date, the Employee will be entitled to participate in such benefit programs as may be made available by the Company to its management employees, including any medical benefit and life insurance plans in effect from time to time. The Company will provide the Employee, at the Company's expense, with a cell phone and a laptop computer for conducting Company business.

3.4  **Vacation:** The Employee shall be entitled to twenty (20) business days' paid vacation within the first and each subsequent year of employment, to be taken on reasonable notice to management and at times reasonable to the requirements of the Company and the Employee.

### 4.0 OPTIONS

As of the commencement of employment, the Employee shall be granted options ("Options") pursuant to the Company's Stock Option Plan (the "Stock Option Plan"), that provide the Employee with the right to purchase 60,000 common shares of the Company. All Options shall be issued by Intellipharmaceutics International Inc. The Options shall be exercisable for a period of 10 years and shall be subject to the terms of the Stock Option Plan and section 6.4 of this Agreement, provided that:

- 3 -

    (a)    the Options shall vest as follows:

        (i)    20,000 Options shall vest immediately on issuance;

        (ii)    an additional 40,000 Options shall vest as to 20,000 Options annually on each of the first and the second anniversaries of the Commencement Date; and

        (iii)    if the Employee's employment with the Company is terminated without cause at any time or if the Company terminates the Agreement under section 6.2(b), the Employee shall retain all Options that have vested to that time;

    (b)    the exercise price for the Options shall be the volume weighted average trading price of the Company's common shares on the TSX and NASDAQ for the 5 business days before the approval of the issuance of the Options by the Board of Directors of the Company; and

    (c)    in the event that there is a transfer in the ownership or control of the Company, then at a time immediately before such transfer all options granted to the Employee to that point and not yet vested shall vest, or be deemed to have vested, immediately prior to such transfer.

## 5.0 EXPENSES

5.1    The Company shall pay all expenses actually and properly incurred by the Employee incurred in accordance with Company policy. Prior to being reimbursed for such expenses, the Employee will provide such statements or receipts as may be necessary to evidence the expenditures referred to above.

## 6.0 TERM AND TERMINATION

6.1    This Agreement will be until December 31, 2017 and shall be renewed automatically for successive periods of one calendar year in absence of written notice of termination ("**Notice of Termination**") being delivered to the Employee at least 90 days prior to the end of the then applicable term, subject to Section 6.2. For greater certainty, in the event of a December 31 termination under this Section 6.1, the applicable severance payment set out in Section 6.2(a) or Section 6.2(b) shall be paid at such termination date.

6.2    The Company may terminate this Agreement and the employment herein at any time by Notice of Termination, in its sole discretion provided that:

    (a)    Where such termination is made by the Company without cause, the Employee shall have the right to receive, as a full and final settlement relating to employment compensation, 3 months' then applicable Base Salary, plus 6 weeks' Base Salary for every full year of service after the date hereof, up to a combined maximum of 12 months, pro-rated for the applicable period.

    (b)    Where such termination occurs within 6 months of a Change of Control of the Company, the Employee shall have the right to receive, as a full and final settlement relating to employment compensation, 13 months' then applicable

- 4 -

Base Salary, plus 6 weeks' Base Salary for every full year of service after the date hereof, up to a combined maximum of 18 months, pro-rated for the applicable period. Subsections (a) and (b) herein are distinct, in the alternative as the facts may be, and not cumulative. For the purposes of this subsection, "Change of Control" means the sale of all or substantially all of the assets of the Company; any merger, consolidation or acquisition of the Company with, by or into another corporation, entity or person; or any change in the ownership of more than 50% of the voting capital stock of the Company in one or more related transactions.

(c) Where such termination is made by the Company for just cause at common law, such termination may be made without advance notice or payment of Base Salary or other compensation in lieu of advance notice. Such termination, by Notice of Termination, shall be effective immediately upon delivery to the Employee.

(d) All salary and vacation pay owed to the date of termination, or to which the Employee is otherwise entitled, shall be paid as soon as is practicable following such termination.

6.3 The Employee may terminate this Agreement at any time by written notice to the Company of not less than 30 business days. If the Employee so terminates the Agreement, the Employee agrees to provide such assistance to his successor in the position as may be reasonably requested at times mutually agreeable to the Employee and the Company for a period up to 60 days from such written notice.

6.4 Upon any termination, this Agreement is fully terminated as at the date stated in the Notice of Termination, save only for the ongoing obligations of the Employee and the Company set out in 4.0, 6.0, 8.0, 9.0, 10.0 and 11.0 hereof and the rights to Options and to exercise Options shall terminate except as provided for herein and in the Option Plan. Upon any termination of the employment provided for in this Agreement, whether with or without notice, or with or without just cause, the Employee hereby agrees that he will immediately:

(i) turn over to the Company all Company property including, without limitation, all keys, pass cards, badges, business cards, identification or other security devices, all Confidential Information in his possession or control as contemplated herein, all Company health, medical, dental or other benefit cards or identification cards, all Company credit or debit cards, Company cellphone and laptop, and all other tangible or intangible property of the Company;

(ii) gather together all of his own belongings and personal effects, without delay, permitting a Company representative to verify that they are not Company property;

(iii) permit a Company representative to remain with him at all times following receipt of Notice of Termination, until he has left the Company premises; and

(iv) upon completion of the duties set out above, promptly leave the Company premises; and

- 5 -

       (v)    return to the Company within 24 hours any Company property in his control but not then on the premises.

6.5    Upon any termination of the Employment contemplated by this Agreement, the Employee's participation in any employee benefit plans, including without limitation, all health, medical, dental plans and disability plans, shall terminate forthwith upon notification of termination, or forthwith upon the expiry of the notice period following delivery of a notice of termination as prescribed from time to time by the Employment Standards Act 2000 of Ontario, or forthwith upon the expiry of the number of months of compensation applicable under Sections 6.2(a) or (b), if applicable, whichever is the later, provided that such benefits will terminate forthwith upon the Employee becoming covered under the benefit plan of another employer, all unless otherwise agreed in writing by the parties at the time of such termination, and subject always to the operation of the laws of Ontario.

6.6    Upon any termination of the Employment contemplated by this Agreement, the Company undertakes that it will forthwith make an accounting of all monies, if any, then owing to the Employee, and that the same and any related documents then owing to the Employee will be transmitted to the mailing address of the Employee as set out herein, or to such other address as instructed by the Employee, at the usual time for so doing.

## 7.0    WAIVER

7.1    The Employee hereby agrees that the obligations of the Company contained in section 6.2 hereof constitute the entire obligation of the Company to the Employee with regard to notice or payment in lieu of notice in the event of termination. The Employee hereby releases the Company from any other obligation arising from termination of his employment with the Company except that which is contained in Section 6.2 of this Agreement.

## 8.0    CONFIDENTIAL INFORMATION

8.1    The Employee acknowledges that the success of the Company's business depends significantly upon the maintenance of trade secrets, technical innovations and other Confidential Information, which is proprietary, that the Company has purchased or developed or will purchase or develop at its own cost and expense. The Employee also acknowledges that he will necessarily be involved, as a consequence of his employment, with information and processes, the disclosure of which would be to the great detriment of the Company.

8.2    The Employee acknowledges that such Confidential Information could be used to the detriment of the Company and that the disclosure of such Confidential Information would cause irreparable harm to the Company. Accordingly, the Employee undertakes to treat as confidential all Confidential Information and not to disclose or provide it to any third party or to use it for any purpose either during the Employee's employment, except as may be necessary in the proper discharge of the Employee's duties, or for any reason after the conclusion of the Employee's employment with the Company.

8.3    Without in any way limiting the generality of the foregoing, the Employee acknowledges and agrees that all forms, documentation, paper, data, service manuals, technical and other reports, records, files, computer programs (including programs in both human-readable and machine-readable codes, procedures, rules and associated documentation), discs, tapes, printouts, memoranda and other materials used by the Employee or acquired in the course of the Employee's employment with the Company and information or material not disclosed by the

- 6 -

Company to the general public, constitute Confidential Information and are proprietary to the Company. For greater certainty Confidential Information shall not include information which is in or hereafter enters the public domain without breach of this Agreement by the Employee.

8.4  Accordingly, the Employee covenants and agrees that he will not, at any time during the term of this Agreement or at any time following the termination hereof for any reason whatsoever, reveal, divulge or make known to any person (other than the Company and its duly authorized employees, agents and representatives) any Confidential Information, except for purposes of performing his employment duties.

8.5  The Employee covenants and agrees that he will not, at any time during the term of this Agreement or at any time following the termination hereof for any reason whatsoever, reveal, divulge or make known to any person (other than the Company and its duly authorized employees, agents and representatives) or make use of, for his own or any other person's benefit, the Company's list of customers, or clients or its trade secrets, or his knowledge of any of the business or financial affairs of the Company which, during his employment pursuant hereto, is made known to the Employee (whether or not with the knowledge or permission of the Company and whether or not developed, devised or otherwise created in whole or in part by the Employee). For greater certainty this shall not include information which is in or hereafter enters the public domain without breach of this Agreement by the Employee.

8.6  The Employee undertakes and agrees that, upon termination of the Employee's employment with the Company for any reason whatsoever, the Employee shall return to the Company all such Confidential Information.

9.0  **OWNERSHIP AND ASSIGNMENT OF INTELLECTUAL PROPERTY**

9.1  "Intellectual Property" as used herein means any and all copyrights, trademarks, inventions, patents for invention, know-how and trade secrets used in the course of or relating to the business of the Company. Without restricting the generality of the foregoing, these include without limitation, all written or printed materials fixed in any medium, whether published or not, mathematical models, spreadsheets, algorithms, business models, presentations, chemical or pharmaceutical formulae, laboratory notes, analytical methods, notes, data, tapes, reference items, sketches, drawings, memoranda, records and other materials (including tools and data), relating to any of the Company's business or to the Confidential Information, produced by the Employee or coming into the Employee's possession by or through the Employee's employment. All such Intellectual Property is, at the moment of its creation and at all material times, the exclusive property of the Company. The Employee agrees to turn over to the Company all originals and copies of any such materials in his possession or control, forthwith at the request of the Company or, in the absence of a request, on the date he receives or gives notification of termination of this agreement.

9.2  For the purposes of this agreement, Inventions shall include all inventions, trade secrets, formulae, analytical methods, improvements or discoveries, works of authorship (including notes, illustrations, data, tapes, writings, reference items, memoranda, sketches, drawings, laboratory records, software and computer programs) and all other business or technical information or material (including tools) created or conceived by the Employee, either alone or with others, while in the employ of the Company or resulting from the employment of the Employee by the Company. Any Invention completed or disclosed to any third party within one (1) year after notification of termination of the employment herein shall be deemed to have been conceived

during and as a consequence of the of the Employee's period of employment with the Company, unless the Employee is able to provide specific evidence in writing to the contrary.

9.3    The Employee acknowledges and agrees that any and all Inventions are the sole and exclusive property of the Company.

9.4    The Employee agrees to disclose fully, promptly and in writing the existence or/and details of all Inventions made by him or with his participation, and to comply with all Company policies as may be put in place from time to time concerning disclosure and reporting of Inventions.

9.5    Employee agrees to turn over to the Company all documents and any copies thereof concerning Inventions in his possession or under his control, forthwith, at the request of the Company or, in the absence of a request, on the date his contractual relationship with the Company ends.

9.6    The Employee agrees to assign to the Company, as necessary, in a form and manner acceptable solely to the Company, all of the Employee's rights, title and interest in and to all Inventions as may have vested in him by his action or omission, or by negligence or inadvertence, or by operation of laws, and further agrees that until such transfer is effected, he will hold such Inventions in trust for the Company, and will do no act or make no omission to impair them in any way. Without limitation on the generality of the foregoing, in respect of any Invention which is the subject of copyright, the Employee hereby waives any "moral rights" he may have in the material, and expressly authorizes the Company to amend and use such materials in its sole discretion.

9.7    Upon receipt of a written request from the Company, the Employee agrees to provide all assistance necessary, both during and after the Employee's employment, to enable the company to:

      (i)    obtain for its sole benefit and use, patents or other registered rights for Inventions in any country, and

      (ii)   successfully defend (or prosecute as the case may be), any litigation arising out of a dispute related to any Inventions.

### 10.0    NON-COMPETITION

10.1    The Employee undertakes and agrees that during the term of this Agreement and for a period of three months from the date the Employee's employment with the Company ends, he will not without the Company's prior written consent, for any reason whatsoever, either directly or indirectly, alone or in partnership, or as an officer, director, shareholder or employee of a corporation or organization, engage in the business in North America of development or formulation of generic pharmaceutical oral, solid dose products for a product for which the Company has submitted an application or clinical trial protocol to the Food and Drug Administration; save that the foregoing shall not prohibit Employee from holding up to five percent (5%) of the issued and outstanding securities of a body corporate, the securities of which are listed on a recognized stock exchange.

## 11.0  NON-SOLICITATION

11.1  The Employee acknowledges and agrees that the success of the Company's business is in large measure dependent upon the establishment and maintenance of a close relationship with its customers, clients and suppliers. Accordingly, the Employee covenants and agrees that he will not, at any time during the term of this Agreement, or at any time in the first twelve (12) months following the termination of this Agreement, solicit, interfere with or endeavour to entice away from the Company any customer, client or supplier of the Company.

11.2  The Employee undertakes and agrees that he will not, during the term of this Agreement or for a period of twelve (12) months following termination of this Agreement for any reason whatsoever, either directly or indirectly, alone or in partnership, or as an officer, director, shareholder or employee of a corporation or organization solicit or seek to engage the services of any employees of the Company whether for remuneration or otherwise and whether as employee, independent contractor or otherwise in any manner or for any purpose whatsoever.

## 12.0  COMPANY'S REMEDIES

12.1  The Employee agrees that the restrictions and covenants contained in this Agreement are reasonably required for the protection of the Company and its goodwill, and that the Employee's Agreement to same constitute a material inducement to the Company to employ, or continue to employ, the Employee and that the Company would not employ the Employee absent such an inducement.

12.2  The Employee understands and agrees that, without prejudice to any and all other rights of the Company, that in the event of his violation or attempted violation of any of the covenants contained in this Agreement, an interlocutory and permanent injunction or other like remedy shall be the only effective method to protect the Company's rights and property as set out above, and that an interlocutory injunction may be granted immediately on the commencement of any suit, and that the Employee will not contest the Company's right to an interlocutory injunction on the ground that the anticipated harm is not irreparable.

## 13.0  AUTHORITY OF EMPLOYEE

13.1  The Employee shall not have the power or authority to bind the Company to any obligation or agreement except in accordance with Company policy.

## 14.0  ENTIRE AGREEMENT

14.1  This Agreement supercedes and replaces all prior agreements between the Employee and the Company or its predecessors. This Agreement together with the provisions of such policies, guidelines, rules and regulations of the Company as may be contained in bulletins, manuals and directions, memos, schedules published or posted from time to time by the Company, and the Stock Option Plan constitute the entire agreement of the parties hereto with reference to the employment of the Employee by the Company and with reference to all the matters referred to herein, and all promises, representations and undertakings relative to such employment. This Agreement shall not be amended or modified in any respect except by written instrument signed by both parties.

## 15.0 EXTENDED MEANINGS

15.1 Words importing the singular number include the plural and vice versa and words importing gender include all genders.

## 16.0 INTERPRETATION NOT AFFECTED BY HEADINGS

16.1 The division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 17.0 APPLICABLE LAW

17.1 This Agreement shall be interpreted in accordance with the laws of the Province of Ontario and the parties hereto specifically submit to the exclusive jurisdiction of the courts thereof. Notwithstanding the foregoing, nothing herein shall prevent the Company from taking proceedings to enforce the provisions of this Agreement in any other court of competent jurisdiction.

## 18.0 SEVERABILITY

18.1 The invalidity or unenforceability of any provision of this Agreement or any part thereof shall not affect the validity or enforceability of any other provision hereof.

## 19.0 CURRENCY

19.1 Unless otherwise specifically provided herein, all references to dollar amounts herein or any other money amounts are expressed in terms of lawful money of Canada.

## 20.0 INDEPENDENT LEGAL ADVICE

20.1 The Employee acknowledges that he has been given time to read and has read, understood and agrees with the contents of this Agreement. The Employee further acknowledges that he has been advised and given time to seek independent legal advice as to the terms of this agreement, and has so received such advice, and understands, accepts and is willing to abide by the terms contained herein. The Employee states that the agreement herein is executed of his own free will.

Executed at Toronto, Ontario as of the date first-above written.

| INTELLIPHARMACEUTICS INTERNATIONAL INC. | INTELLIPHARMACEUTICS CORP. |
|---|---|
| *[signature]* | *[signature]* |
| Per: Amina Odidi | Per: Amina Odidi |
| Title: President & COO | Title: President & COO |

| | |
|---|---|
| *[signature]* | *[signature]* |
| Witness | **ANDREW PATIENT** |
| MICHAEL CAMPBELL | |

## SCHEDULE A
### (Paragraph 2.1(a))

### Duties & Responsibilities as Chief Financial Officer

The Chief Financial Officer ("CFO") shall report to the President and CEO and this role will be an integral part of the senior management team providing leadership, business and financial acumen to the overall strategic direction and corporate development of the organization and in the development and maintenance of modern governance and financial best practices of the Company and its affiliates.

The CFO shall manage, oversee and update effective and streamlined financial and accounting systems.

As a member of the senior management team, the CFO will be involved in strategic planning, evaluation, and development initiatives.

The key responsibilities of this position include:

- Responsibility for finance, treasury and accounting functions, and customary CFO matters generally, as well as related support functions (e.g. treasury and tax and, in support of the Chairman and COO positions) relating to the Company and its affiliates

- Provision of strong financial leadership to an organization expected to rapidly grow in complexity, including the development of robust cost-accounting systems and active planning and communication with the financial industry to meet the Company's financial needs

- Ensure that effective internal controls are in place and ensure compliance with GAAP and applicable federal, state and local regulatory laws, applicable securities laws and rules for financial and tax reporting.

- Provision of financial input into the business development process

- Provision of direction for accounting, tax and treasury activities, including financial reporting, general accounting, financial planning, capital planning, and analysis of results from operations, cash management.

- Provision of sound financial management to the business including directing the development of financial policies, systems and internal controls, and managing their implementation and review to support Canadian and US certification requirements.

- Provision of financial analysis, budgeting, financial forecasting, and present and projected cash flow information.

- Provision of financial perspective in circumstances where the company plans to enter into key strategic relationships with other organizations as well as financial arrangements the company might consider such as mergers and acquisitions, licensing agreements, joint ventures, and strategic alliances.

- Development and maintenance of relationships with banking, and insurance personnel in order to facilitate financial activities.

- As necessary, the provision of assistance in the recruitment and leadership of a high performing finance and accounting team.

- Provision of a key interface with external auditors on consolidated financial statement preparation and review, and maintenance of technical standards and an internal control framework.

- Oversight over all internal reporting

- Responsibility for all external financial reporting

- Ensuring compliance with SEC/NASDAQ/OSC/TSX regulations, Sarbanes Oxley regulations when required, and other relevant regulatory provisions

- Oversight of the budgeting/performance management processes to ensure that they continue to meet the growing needs of the organization and provision to the executive group of timely and relevant information

- Management of relevant corporate communication including news releases, annual and quarterly reports and the Company website

- the exercise of such other powers and performance of such other duties as from time to time may be assigned by the CEO or President/COO.

TOR_LAW\ 9250161\2