```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
ALPHA CAPITAL ANSTALT,                 :
                                       :
                      Plaintiff,       :    19cv9270 (DLC)
                                       :
              -v-                      :    OPINION AND ORDER
                                       :
INTELLIPHARMACEUTICS INTERNATIONAL     :
INC., ISA ODIDI, AMINA ODIDI, and      :
ANDREW PATIENT,                        :
                                       :
                      Defendants.      :
                                       :
-------------------------------------- X
```

APPEARANCES

For plaintiff Alpha Capital Anstalt:
David Scott Hoffner
Hoffner PLLC
800 Third Avenue, 13th Floor
New York, NY 10022

For defendants Intellipharmaceutics International Inc., Isa Odidi, Amina Odidi, and Andrew Patient:
Steven S. Fitzgerald
Chloe S. Booth
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110

DENISE COTE, District Judge:

Plaintiff Alpha Capital Anstalt ("Alpha") has sued defendants Intellipharmaceutics International Inc. ("IPCI"), Isa Odidi, Amina Odidi, and Andrew Patient (the "Defendants"), alleging that they violated various provisions of federal securities law when they did not timely disclose to investors

1

that Patient planned to leave his role as chief financial officer ("CFO") of IPCI. Alpha and the Defendants have cross-moved for summary judgment on the issue of liability, pursuant to Rule 56, Fed R. Civ. P. For the following reasons, Defendants' motion is granted.

**Background**

The following facts are undisputed, unless otherwise noted.

Defendant IPCI is a pharmaceutical company based in Toronto, Canada. IPCI's stock is publicly traded in the United States on the NASDAQ exchange, and is also traded on a Canadian stock exchange. Defendant Isa Odidi served as IPCI's chief executive officer and the chairman of its board of directors, and defendant Amina Odidi was IPCI's president and served on IPCI's board, during the events at issue in this litigation. Defendant Andrew Patient was hired as CFO of IPCI during August 2017. He departed IPCI in 2018, which gave rise to the events at the heart of this litigation. Alpha is an institutional investor based in Liechtenstein.

In 2018, IPCI decided to raise capital to fund the completion of clinical trials for one of its pharmaceutical products. On September 20, 2018, IPCI filed a registration statement and prospectus for the sale of its securities with the Securities and Exchange Commission ("SEC"). IPCI amended the

2

registration statement twice, and the final version (hereinafter the "Registration Statement")[1] became effective on October 11, 2018. Isa Odidi, Amina Odidi, and Patient executed the Registration Statement in their capacities as officers of IPCI. The Registration Statement did not disclose the impending departure or potential departure of any members of IPCI's management team, but did disclose that "[a]lthough we have employment agreements with key members of our management team, each of our employees may terminate his or her employment at any time."

IPCI sold, pursuant to the Registration Statement and the prospectus, securities designated as "Units" and "Pre-Funded Units." Each Unit contained both one share of IPCI common stock and one warrant to purchase a single share of IPCI common stock at a price of $0.75, expiring five years from the issuance of the warrant. Each Pre-Funded Unit contained one pre-funded warrant to purchase a single common share of IPCI at a price of $0.01, expiring upon exercise, and one warrant to purchase a single share of IPCI common stock at a price of $0.75, expiring five years from the issuance of the warrant. After a presentation by IPCI officials and internal discussion among

---

[1] Subsequent references to the "Registration Statement" in this Opinion are to the final version of the IPCI registration statement that became effective on October 11, 2018.

Alpha employees, Alpha purchased 2,266,667 Pre-Funded Units on October 12, 2018 for $1,677,333.[2] On December 3, 2018, Alpha purchased an additional 279,618 shares of IPCI common stock.

Between October 2018 and January 2020, Alpha exercised most of the pre-funded warrants it had purchased on October 12, 2018 and sold most of its common stock in IPCI. Alpha retains only 24,418 pre-funded warrants, of over two million originally purchased.

On September 17, 2018, before the Registration Statement was issued, Patient entered into an employment agreement with a company called Mimi's Rock. In November 2018, Patient notified IPCI of his intent to resign as CFO, effective November 30, 2018.[3] On November 5, 2018, IPCI issued a press release announcing Patient's resignation and filed the press release

---

[2] The parties dispute the nature of the presentation by IPCI officials, as well as the details of the internal evaluation process within Alpha that led Alpha to invest in IPCI. These factual disputes, however, are not relevant to the resolution of the motions for summary judgment.

[3] The parties present a number of factual disputes regarding when Patient notified IPCI, Isa Odidi, and Amina Odidi of his intent to resign, as well as disputes related to whether Patient's employment agreements with IPCI and Mimi's Rock permitted him to work part-time at both companies or provide consulting services to one company while working at the other. The cross-motions for summary judgment may be resolved without addressing these factual disputes.

4

with the SEC.  The press release was issued after the close of the market.

At the opening of trading on November 6, 2018, IPCI's stock price was $0.58, and by the close of the market on November 6, IPCI's stock price was $0.53.  IPCI's stock traded in a range between $0.46 per share and $0.64 per share until November 27, 2018, when it closed at a price of $0.34 per share.  Between October 11, 2018 and November 6, 2018, IPCI's stock price had declined from a high of $1.50 per share reached during the trading day on October 11 to a price of $0.58 per share at the opening of the market on November 6.

On October 7, 2019, Alpha initiated this action.  Alpha asserts claims against all Defendants for a violation of § 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k; against IPCI, Isa Odidi, and Patient under § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2); and control person claims against Patient, Isa Odidi, and Amina Odidi under § 15 of the 1933 Act, 15 U.S.C. § 77o.  The Defendants moved to dismiss the complaint on December 12, and the motion to dismiss became fully submitted on March 6, 2020.  In an Opinion of June 18, the motion to dismiss was largely denied, with the exception of Alpha's Section 12(a)(2) claim against Isa Odidi.  <u>Alpha Capital Anstalt v. Intellipharmaceutics International Inc.</u>, No. 19cv9270

5

(DLC), 2020 WL 3318029 (S.D.N.Y. June 8, 2020). In that Opinion, the Court held, among other things, that Alpha had plausibly alleged that the Registration Statement contained a material omission, and that IPCI and Patient were statutory sellers under § 12(a)(2). Id. at *3-5.

On January 15, 2021, following the close of discovery, the parties cross-moved for summary judgment on the remaining claims. The cross-motions for summary judgment both became fully submitted on February 19, 2021.

## Discussion

Summary judgment may be granted if the parties' submissions "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020) (citation omitted). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment." Weiss v. Nat'l Westminster Bank, PLC., 993

6

F.3d 144, 162 (2d Cir. 2021). "[T]he party against whom summary judgment is sought" must be "given the benefit of all permissible inferences and all credibility assessments." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017). In deciding cross-motions for summary judgment, a court must, with respect to each motion, "constru[e] the evidence in the light most favorable to the non-moving party." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018) (citation omitted).

"Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). A non-movant's "response . . . must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "metaphysical doubt as to the material facts," Robinson, 781 F.3d at 44 (citation omitted).

Alpha has brought claims under §§ 11, 12(a)(2), and 15 of the 1933 Act, but the parties' cross-motions for summary

7

judgment on liability turn on, essentially, two issues: whether the Registration Statement at issue in this litigation contained material omissions because it failed to disclose that Patient intended to leave his role as CFO of IPCI shortly after the offering of securities outlined in the Registration Statement, and if it did, whether the omission caused Alpha to incur losses. Alpha has moved for summary judgment on the grounds that the omission was material as a matter of law, thereby subjecting the Defendants to liability under these strict liability statutes. The Defendants have moved for summary judgment on the basis that the omission was immaterial as a matter of law and, in any event, did not cause Alpha to incur any losses, precluding liability under any of the three provisions. For the following reasons, the Defendants' motion for summary judgment is granted because the Defendants have proven that Alpha's losses did not result from any statement or omission challenged by Alpha, and Alpha has failed to raise a question of fact regarding the Defendants' proof.

I. Applicable Law

Section 11 of the 1933 Act imposes liability on an issuer of a registration statement under three circumstances:

> if (1) the statement contained an untrue statement of a material fact, (2) the statement omitted to state a material fact required to be stated therein, or (3)

> the omitted information was necessary to make the
> statements therein not misleading.

Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 36 (2d Cir. 2017) (quoting 15 U.S.C. § 77k(a)). "Claims under sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements," New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC, 709 F.3d 109, 120 (2d Cir. 2013) (citation omitted), and "the success of a claim under section 15 relies . . . on a plaintiff's ability to demonstrate primary liability under sections 11 and 12," In re Morgan Stanley Information Fund Securities Litigation (Morgan Stanley), 592 F.3d 347, 358 (2d Cir. 2010).

Ordinarily, a plaintiff pursuing a § 11 or 12(a)(2) claim, or a § 15 control person claim predicated on a primary violation of § 11 or 12(a)(2), "need not allege scienter, reliance, or loss causation." Morgan Stanley, 592 F.3d at 359. If a defendant proves, however, that "any portion or all" of the loss alleged to have resulted from the materially false statement or omission in fact "represents other than the depreciation in value of such security resulting from" the alleged materially false statement or omission, "such portion of or all such damages shall not be recoverable." 15 U.S.C. § 77k(e). This "negative loss causation" defense is "an affirmative defense to be proven by defendants, not a prima facie element of [a § 11 or

9

12(a)(2) claim] to be proven by plaintiffs." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc. (FHFA), 873 F.3d 85, 153 (2d Cir. 2017). A court "be[gins] with the presumption that any decline in value was caused by the . . . misrepresentations," and "[d]efendants [may] break that causal link only by proving that the risk that caused the losses was not within the zone of risk concealed by the misrepresentations and omissions," or that "the subject of the . . . misstatements and omissions was not the cause of the actual loss suffered." Id. at 154 (citation omitted). A defendant faces a "heavy burden" in proving a negative loss causation defense. Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 341 (2d Cir. 1987).

II. Analysis

The Defendants have moved for summary judgment on the grounds that, even if they omitted material information from the Registration Statement, the negative loss causation defense bars Alpha's claims. For the following reasons, the Defendants have met their burden of proving their negative loss causation defense, and their motion for summary judgment is granted.

A. The Defendants' Case for Negative Loss Causation

In support of their negative loss causation defense, the Defendants rely largely on the expert report of Dr. Sunita

Surana, an economist.[4] Dr. Surana conducted an event study regarding the Registration Statement, the disclosure of Patient's departure, and IPCI's stock price. Event studies "disentangle the effects of two types of information on stock prices -- information that is specific to the firm under question and information that is likely to affect stock prices marketwide." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 253 (2d Cir. 2016) (citation omitted). They allow "an expert [to] determine whether, and the extent to which, the release of certain information," such as a corrective disclosure revealing that a company previously concealed material information, "caused a stock price to fall." Id. The use of event studies has "become standard operating procedure in federal securities litigation." Id. (citation omitted).

Dr. Surana began her negative loss causation analysis by confirming, based on publicly available electronic databases, the Complaint's allegation that Patient's departure was first revealed to the market after the close of trading on November 5, 2018. She then used a market model that compared the decrease in price of IPCI stock on November 6, 2018 -- after the

---

[4] Alpha Capital has not sought to preclude Dr. Surana's expert testimony under Rule 702, Fed. R. Evid. and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

disclosure of Patient's planned departure -- to other daily fluctuations in IPCI's stock price and fluctuations in United States stock market as a whole, the Canadian stock market as a whole, and various indices of publicly traded pharmaceutical stocks in the United States.

Based on these models, Dr. Surana found that the decline in price occurring between November 5 and 6 "not statistically significant" and "within the normal range of volatility for [IPCI's] excess returns." This result held even when the model was used to analyze changes in IPCI's stock price over a longer period after the November 5 disclosure; the model showed that IPCI's stock price did not experience a statistically significant change on any day between November 6 and 12, nor did it experience a statistically significant change over the period from November 6 to 12 as a whole. Dr. Surana's review also found no further public disclosures by IPCI regarding Patient's departure following the November 5 press release, allowing her to conclude that none of the additional price changes after November 6 were attributable to the disclosure. In sum, Dr. Surana's report indicates that the IPCI stock price decrease -- and any resulting loss to Alpha -- that followed the disclosure of Patient's departure was statistically indistinguishable from normal daily fluctuations in the value of IPCI's stock that

occurred because of broader market developments or developments related to IPCI that Alpha does not allege to be related to Patient-related omissions in the Registration Statement.

    B.    Alpha Capital's Arguments Against Defendants' Negative Loss Causation Defense

The Defendants have set forth compelling evidence to establish that, even if the Registration Statement contained material omissions, those omissions were "not the cause of the actual loss suffered" by Alpha. FHFA, 873 F.3d at 154 (citation omitted). As such, they are entitled to summary judgment. Alpha has set forth several arguments that attempt to create disputed issues of material fact regarding the Defendants' negative loss causation defense, but none are convincing.

Alpha argues that the Defendants have not met their burden of proving negative loss causation because their arguments and expert report focus on the price decline on November 6 after the November 5 disclosure, and do not account for the possibility that IPCI's stock price declined before November 6 because news of Patient's departure had somehow been disclosed to market participants prior to the November 5 disclosure. The Defendants have, however, mustered evidence –- Dr. Surana's declaration based on her review of publicly available electronic databases -- that the information regarding Patient's departure first entered the marketplace when IPCI issued its press release on

13

November 5, and Alpha has produced no evidence to the contrary. At summary judgment, "[t]he time has come . . . to put up or shut up" and accordingly, Alpha's speculation regarding pre-November 5 disclosure does not create a material issue of disputed fact. Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

Alpha also attempts to create a dispute of material fact by relying on an expert report of Daniel Bettencourt that calls into question the methodology of Dr. Surana's report and its conclusion that the Defendants' failure to disclose Patient's departure was not responsible for Alpha's losses. For several reasons, Alpha's arguments premised on Bettencourt's report are unpersuasive.

To begin with, Bettencourt's report does not present admissible evidence because it is unsworn. While a declaration need not be sworn in order to be considered on a motion for summary judgment, Fed. R. Civ. P. 56(c), an unsworn declaration must substantially comply with the requirements of 28 U.S.C. § 1746, which requires unsworn statements like the Bettencourt report to be signed and contain certain language confirming that the statement was made under penalty of perjury. The Second Circuit has held that the requirements of § 1746 are mandatory. In re World Trade Center Disaster Site Litigation, 722 F.3d 483,

487-88 (2d Cir. 2013). Bettencourt's report is signed but does not include the language required by § 1746. It is therefore inadmissible.

Even if § 1746 did not bar consideration of Bettencourt's report, it would be inadmissible under the principles set out by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and even if admissible, it would be insufficient to create a dispute of material fact. When presented in the context of a motion for summary judgment, expert testimony must be excluded pursuant to Daubert "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted). "[T]he district court functions as the gatekeeper for expert testimony" at summary judgment. Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (citation omitted).

Bettencourt's report is both inadmissible and incapable of creating a dispute of material fact regarding the Defendants' negative loss causation defense because it is based on conjecture. Bettencourt did not conduct an event study or other analysis of his own. Instead, his report merely argues that Dr.

15

Surana's conclusions are unsupported by the statistical analysis described in her report. His assertions, however, are almost entirely ipse dixit unsupported by citations to accepted practice or academic literature in the relevant area of economic analysis. "An expert's conclusory opinions are . . . inappropriate" for consideration on a motion for summary judgment. Salvino, 542 F.3d at 311; see also Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 253-54 (2d Cir. 2005).

Moreover, Bettencourt's expert report is not credible because it reflects a fundamental misapprehension of the function and purpose of Dr. Surana's event study. For instance, Bettencourt attempts to undermine the credibility of Dr. Surana's report by noting that "IPCI stock continued to decline for three of the five days she considered in her event study for the days following 6 November 2018" and that the report "merely asserts that none of these declines can be related to the Plaintiff's allegations." Dr. Surana's report, however, does not "merely assert[]" that the decline was unrelated to Alpha's allegations: it demonstrates, based on a statistical methodology used widely in the field and regularly credited by courts in similar cases, that the observed decline was statistically indistinguishable from a decline caused by chance or by broader market dynamics.

16

Finally, Bettencourt's expert report does not create a dispute of material fact because it relies upon unrealistic and incorrect assumptions about the relevant legal standards governing Alpha's claims and the negative loss causation defense. For example, Bettencourt's report repeatedly contends as a basis for discrediting Dr. Surana's expert report that it is necessary to show that a security traded in an efficient market before an event study may be used to assess whether negative loss causation may apply. But Bettencourt cites no legal or economic authority for this proposition.

Indeed, Bettencourt's assertions regarding the necessity of market efficiency appear to conflate the § 11 and 12(a)(2) claims at issue in this case with claims alleging violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5. Rule 10b-5 claims require a showing of, among other things, "reliance [by a plaintiff] upon [a] misrepresentation or omission [by a defendant]." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014). It is true that a plaintiff can satisfy the reliance element of a Rule 10b-5 claim by invoking the so-called fraud-on-the-market theory, which allows for a presumption of reliance upon a showing that, inter alia, the defendant made a misrepresentation about a "stock [that] traded

17

in an efficient market." Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 141 S.Ct. 1951, 1958 (2021). But, as noted above, reliance is not an element of Alpha's § 11 or § 12(a)(2) claims, Morgan Stanley, 592 F.3d at 359, and in any event, "[l]oss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock," Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 812 (2011). The Defendants therefore need not address market efficiency to prove negative loss causation. "[O]n both the materiality and loss causation fronts . . . the market efficiency issue [is] a red herring" in the context of a § 11 claim. In re Constar International Inc. Securities Litigation, 585 F.3d 774, 785 (3d Cir. 2009).

In sum, the Defendants have provided evidence that the November 5 press release did not cause the declines in IPCI's stock price cited by Alpha. The Bettencourt report is inadmissible and lacks credibility, and Alpha has not otherwise presented admissible evidence sufficient to create a material issue of fact regarding the Defendants' negative loss causation defense. The Defendants have therefore established a negative loss causation defense to Alpha's claims.

## Conclusion

The Defendants' January 15 motion for summary judgment is granted, and Alpha Capital's motion for summary judgment is denied. The Clerk of Court shall enter judgment for the Defendants and close this case.

Dated:  New York, New York
        July 9, 2021

```
                              _____
                                     DENISE COTE
                              United States District Judge
```